UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SCOTT CRAIG BRADLEY,
    *Plaintiff*,

v.

NANCY A. BERRYHILL,
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,
    *Defendant*.

No. 3:16-cv-01478(JAM)

**RULING ON CROSS MOTIONS TO REVERSE AND AFFIRM DECISION
OF THE COMMISSIONER OF SOCIAL SECURITY**

Plaintiff Scott Craig Bradley alleges that he is disabled and cannot work as a result of a combination of impairments, including anxiety and pervasive developmental disorder. He has brought this action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of defendant Commissioner of Social Security denying his claim for disability insurance benefits and supplemental security income benefits. For the reasons that follow, I will grant plaintiff's motion to remand the Commissioner's decision (Doc. #17) and deny defendant's motion to affirm the Commissioner's decision (Doc. #24).[1]

**BACKGROUND**

The Court refers to the transcripts provided by the Commissioner. *See* Doc. #11-1 through Doc. #11-9. Plaintiff is a 36-year-old man who lives in Hamden, Connecticut. His most recent long-term employer was a liquor wholesaler, where he worked in the orders department.

---

[1] At the time this case was filed, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration. On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner. When a public officer ceases to hold office while an action is pending, the officer's successor is automatically substituted as a party. *See* Fed. R. Civ. P. 25(d). Later proceedings should be in the substituted party's name and the court may order substitution at any time. *Ibid.* The Clerk of Court shall amend the caption in this case.

1

After he was terminated from that job in 2007, he held several other jobs, each for no more than a few months. He has not engaged in substantial gainful work since October 20, 2009, the alleged onset date of his disability. Plaintiff's medical records reveal a variety of mental health issues, including pervasive developmental disorder, general anxiety disorder, attention deficit hyperactivity disorder, autism disorder, and mild depression.

The Social Security Administration (SSA) initially denied plaintiff's claim for benefits in April 2013 and affirmed the denial upon reconsideration in December 2013. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). ALJ Robert A. DiBiccaro held a hearing in December 2014 and a supplemental hearing in March 2015. Plaintiff was represented by an attorney at both hearings. Plaintiff, his sister, and a vocational expert (VE) all testified.

In his decision of July 27, 2015, the ALJ found that plaintiff suffered from a number of severe impairments, including a history of right tibial fracture, pervasive developmental disorder, general anxiety disorder, attention hyperactivity disorder, autism disorder, and mild depression. Doc. #11-3 at 33. The ALJ determined that plaintiff had the

> residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is able to frequently use his upper extremities for handling, fingering, and feeling. He is limited to no more than occasional interaction with supervisors and coworkers. The claimant should avoid working in close proximity with coworkers. He should avoid work with the public. The claimant is limited to work that involves simple instructions and routine, repetitive tasks. He can stay on tasks for more than 90 percent of the workday. The claimant should avoid travel to unfamiliar places, and perform high-paced or stressful work (such as piecework).

*Id.* at 35. The ALJ then concluded that plaintiff could no longer perform any of his past relevant work, *id.* at 51, but that he could nevertheless perform jobs that exist in significant numbers in the national economy (based on the testimony of the VE) and thus was not disabled. *Id.* at 52–53.

The Appeals Council declined to review the ALJ's decision in June 2016. Plaintiff then filed this federal action asking the Court to reverse the Commissioner's decision or remand the case for rehearing. Doc. #17. The Commissioner has moved to affirm the Commissioner's decision. Doc. #24. On July 11, 2017, this Court heard oral argument on the parties' motions.

## DISCUSSION

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, this Court must uphold the Commissioner's decision if it is supported by substantial evidence and even if this Court might have ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

To qualify as disabled, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and "the impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A)). "[W]ork exists in the national economy when it exists in significant

numbers either in the region where [a claimant] live[s] or in several other regions of the country," and "when there is a significant number of jobs (in one or more occupations) having requirements which [a claimant] [is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(a)–(b); *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009).

To evaluate a claimant's disability and determine whether he qualifies for benefits, the agency engages in a well-established five-step process. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122–23 (2d Cir. 2012). The claimant bears the burden of proving his case at steps one through four. Before step four, the ALJ is required to identify the plaintiff's residual functional capacity ("RFC"), which is "the most the claimant can still do in a work setting despite the limitations imposed by his impairments." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (*per curiam*). At step five, the burden shifts to the Commissioner to demonstrate that there is other work that the claimant can perform, based on the claimant's RFC, age, education, and past relevant work. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). Specifically, "the Commissioner must determine [at step five] that significant numbers of jobs exist in the national economy that the plaintiff can perform. . . . An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert. An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion. . . ." *Id*. (citations and internal quotation marks omitted).

Plaintiff contends that the ALJ made several errors in reaching his conclusion that plaintiff was not disabled. He argues: (1) that the ALJ erred in concluding that there were jobs available to plaintiff in the national economy, in light of the VE's testimony about off-task time;

4

(2) that the ALJ erred in relying on the VE's testimony; (3) that the ALJ violated the treating physician rule; (4) that the ALJ misinterpreted and overly relied on Global Assessment of Functioning (GAF) scores; (5) that the ALJ improperly substituted his own judgment for that of medical experts; and (6) that the ALJ's finding that plaintiff was frequently able to use his upper extremities for handling, fingering, and feeling was unsupported.

### *Alleged Error in Concluding that Available Jobs Existed in the National Economy*

Plaintiff first challenges the ALJ's conclusion that there are jobs in the national economy that he can perform. In formulating plaintiff's RFC, the ALJ found that plaintiff "can stay on tasks for more than 90 percent of the workday." Doc. #11-3 at 35. The ALJ then concluded that plaintiff was capable of performing three jobs that the VE identified at the hearing. The VE, however, testified that the three jobs he had identified would not be available to an individual who could work only 90 percent of the day (in other words, an individual who is off-task for ten percent of the day).[2] Instead, the VE testified, these jobs were available for an individual who was off-task "no more than five minutes per work hour, or about 7.5 percent of the work day."[3] *Id*. at 173. Plaintiff argues that the ALJ's conclusion that there were available jobs would have required a finding that plaintiff could work at least 92.5 percent of the day.

I agree that the ALJ erred. The ALJ's RFC finding of "more than 90 percent" was consistent with plaintiff being off-task for, say, nine percent of the workday. And if that were so, then according to the VE's uncontradicted testimony, there would be no jobs available to plaintiff. Although the difference between 90 and 92.5 percent may seem slight, the VE

---

[2] The VE originally suggested in an answer to the ALJ that jobs were available to someone who could work "at least 90 percent of the workday." Doc. #24-1 at 27 (citing Doc. #11-3 at 159–61). However, after plaintiff's counsel probed further, the VE explicitly clarified that 90 percent was not enough. Doc. #11-3 at 172.

[3] In fact, five minutes per hour is 8.3 percent, not 7.5 percent, but this discrepancy does not change the substance of plaintiff's argument here, since 8.3 is still less than 10.

explicitly drew a line between those two percentages and believed this distinction to be important. On notice of this distinction, the ALJ then specifically made a finding that plaintiff could stay on task for "more than 90 percent" of the day.

It is true, as the Commissioner now argues, that the ALJ was not required to accept the VE's 92.5 percent cutoff. But in this case, the ALJ did accept it—his opinion explicitly "relie[d] . . . on the vocational expert's testimony." *Id*. at 53.

Because the figure of "more than 90 percent" can be, but is not necessarily, consistent with "more than 92.5 percent," the ALJ's conclusion at step five was not supported by substantial evidence. This error therefore warrants remand. On remand, the ALJ should clarify his RFC finding with respect to plaintiff's ability to stay on task, and should then reconsider his finding at step five, ensuring that this finding is consistent with plaintiff's RFC and is supported by the VE's testimony or by other acceptable evidence.

*Alleged Error in Accepting the Vocational Expert's Testimony*

In addition to challenging the ALJ's conclusion that plaintiff was capable of performing the three jobs that the VE identified, plaintiff also challenges the ALJ's conclusion that those jobs exist in abundance in the national economy. The ALJ reached his conclusion by accepting testimony from the VE. The VE testified that there existed 280,000 cleaner/housekeeper jobs, 48,000 laundry folder jobs, and 95,000 warehouse worker jobs in the United States. In his testimony, the VE explained that he arrived at these numbers using his "experience and [his] knowledge of occupations," as well as "a number of readily-available resources . . . such as OccuBrowse, Job Browser Pro." *Id*. at 167. Plaintiff objects to this testimony on several grounds.

Plaintiff first argues that the ALJ should not have accepted the VE's expertise, because the VE's job as a rehabilitation counselor does not require looking at job incidence numbers at

6

the level of granularity required in a Social Security hearing. But the VE had extensive experience and training in his field, *see* Doc. #11-5 at 90, and a reasonable ALJ could find that someone with the VE's credentials was qualified to testify.

Plaintiff also argues that the ALJ erred by failing to adequately scrutinize the VE's methodology. He claims that the VE's numbers were implausibly high. Plaintiff notes that the three jobs the VE identified all belong to the same category of jobs as described by the Standard Occupational Classification, a system created by the Department of Labor. If the VE's numbers were accurate, then the three occupations the VE identified would comprise one third of all jobs in their category, despite the fact that the category contains 550 other occupations. Plaintiff also claims that the VE's figures are suspect because different VEs in other cases have offered different estimates. In light of these objections, plaintiff argues, the ALJ should have demanded a more precise explanation of the VE's methodology.

I do not agree. In order for an ALJ to reasonably credit testimony from a VE, it is sufficient that "[t]he vocational expert identified the sources he generally consulted to determine such figures." *Galiotti v. Astrue*, 266 F. App'x 66, 68 (2d Cir. 2008). *See also McIntyre*, 758 F.3d at 152 (2d Cir. 2014) (concluding that "the vocational expert was not required to articulate a more specific basis for his opinion, and the ALJ reasonably credited this testimony, which was given on the basis of the expert's professional experience and clinical judgment, and which was not undermined by any evidence in the record."); *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).

In this case, the ALJ gave the VE's testimony the scrutiny that the law requires. He asked the VE what sources the VE used to reach his opinion. While the VE did not explain his exact methodology step by step, he identified his general sources. This, combined with the ALJ's

7

conclusion that the VE had expertise in the field of vocational studies, was enough to entitle the ALJ to accept the VE's testimony. Neither of plaintiff's specific objections undermine this conclusion. First, it is not implausible that a few occupations within a category have the bulk of the category's jobs.[4] Moreover, the methodology and credentials of the other VEs that plaintiff cited were not before the ALJ in this case. It was reasonable for ALJ to decline to give weight to their opinions.

### *Alleged Violation of the Treating Physician Rule*

Plaintiff also argues that the ALJ erred by improperly discounting the medical opinions of Suzanne McColl and Jonathan Lowe, two non-physician medical professionals who treated plaintiff. According to plaintiff, the ALJ was required to give their opinions controlling weight under the "treating physician rule." He argues that "had the ALJ afforded controlling weight to [these opinions] . . . a finding of disability would have been inevitable." Doc. #17-2 at 14.

The treating physician rule "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). The rule may apply in instances when a physician has co-signed an opinion prepared by a non-physician. Where ALJs have disregarded a treating physician's co-signature on a source opinion, this Court has remanded disability determinations so that the ALJ may apply the treating physician rule. *See, e.g.*, *Griffin v. Colvin*, 2016 WL 912164, at *14 (D. Conn. 2016).

The treating physician rule does not apply, however, if the physician did not have a treating relationship with the claimant. *See Petrie v. Astrue,* 412 F. App'x 401, 405 (2d Cir. 2011) (refusing to give controlling weight to one doctor who had only seen plaintiff once and

---

[4]Surely, it is not implausible that housekeepers outnumber many other jobs in its category, like "syrup machine laborer" and "blintze roller," by orders of magnitude. Doc. #11-7 at 77.

8

another doctor who "had only four treatment notes bearing his signature, two of which were merely co-signatures on reports by other providers" and "completed his medical opinion over a year after he had last personally seen [the plaintiff]"); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (doctor who only examined plaintiff "once or twice" was not considered a treating physician, "since he had not seen [the plaintiff] regularly" and thus "had not developed a physician/patient relationship with him").

In this case, the opinions that plaintiff believes should have been assigned controlling weight appear to have been written by McColl, a licensed professional counselor, and Lowe, an advanced practice registered nurse (APRN), but the opinions were also co-signed by a physician, Dr. Charles Riordan. In a March 2013 questionnaire, McColl, with Dr. Riordan as a co-signatory, checked off that plaintiff had a "serious problem" with "[p]erforming work activity on a sustained basis." Doc. #11-8 at 29. She similarly indicated that plaintiff had "an obvious problem" with "[p]erforming basic work activities at a reasonable pace/finishing on time." Both of these problems recurred daily. *Ibid*.

In October 2013, on a questionnaire submitted to the State of Connecticut that was again co-signed by Dr. Riordan, Lowe indicated that plaintiff had an "obvious problem" with both those tasks. *Id.* at 37. Then in December 2013, McColl—again on a questionnaire co-signed by Dr. Riordan—indicated that plaintiff could not work as a result of his conditions and predicted that he would be unable to do so for a year or more, *see id.* at 136, while also stating that plaintiff was able to work part time in "a limited capacity." *Id.* at 133.

Neither these documents nor the record as a whole indicates that Dr. Riordan had a treating relationship with plaintiff. Indeed, the medical records reveal only a single visit by plaintiff to Dr. Riordan. *See* Doc. #11-9 at 81–82. In general, plaintiff's medical records suggest

9

that plaintiff was treated by McColl and Lowe. Dr. Riordan's signature appears on a number of the records that were filled out by McColl and Lowe, but there is no indication that Dr. Riordan saw plaintiff on the dates those records were made. *See, e.g.*, *id.* at 18, 21, 24, 27, 30, 34, 37, 43, 46, 77, 121, 176. His signature also appears on two prescriptions. *Id.* at 56. While a recovery plan from 2011 indicated that Dr. Riordan would be the provider in charge of medical management, the subsequent records suggest that a nurse, Catherine Florio, took on that role.

In total, the record shows, at most, that Dr. Riordan had some involvement in plaintiff's medical treatment. But it does not establish that Dr. Riordan saw plaintiff regularly and formed his own independent medical judgments about him. Therefore, the ALJ did not violate the treating physician rule when he failed to assign controlling weight to the opinions bearing Dr. Riordan's signature. *See, e.g.*, *Payne v. Astrue*, 2011 WL 2471288, at *5 (D. Conn. 2011) (concluding that ALJ was not required to apply treating physician rule where "the court has not been made aware of any evidence that either [co-signing] doctor ever acted as Payne's treating physician, or that Spinner worked in close consultation with either doctor on the treatment of Payne").

But the ALJ did not simply decline to apply the treating physician rule. He also noted that because McColl and Lowe are not psychologists or psychiatrists, they are not considered to be "acceptable medical sources" under the regulations. Doc. #11-3 at 48. The ALJ possibly erred in disregarding Dr. Riordan's co-signature here, regardless of whether he was a treating physician, because opinions that are written by non-physicians but co-signed by physicians may be acceptable medical sources. *See Godin v. Astrue*, 2013 WL 1246791, at *3 (D. Conn. 2013) ("[I]gnoring the co-signature of a physician is significant because the opinion of even a non-examining physician is entitled to consideration in accordance with the guidelines for evaluating

10

all medical opinions"). The ALJ was not necessarily required to classify the opinions as medical sources. For example, he may have been entitled to conclude that the physician's involvement in the treatment was too attenuated. But the ALJ never explicitly considered this issue, because he apparently overlooked the fact that Lowe's and McColl's opinions were co-signed by a physician.[5]

It is not clear what difference (if any) this error made in the ALJ's opinion. According to Social Security Regulations, there are three distinctions between "acceptable medical sources" and other healthcare sources. First, the SSA "need[s] evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment. Second, only 'acceptable medical sources' can give us medical opinions. Third, only 'acceptable medical sources' can be considered treating sources . . . entitled to controlling weight." SSR 06-03P, 2006 WL 2329939 (Aug. 9, 2006) (internal citations omitted). However, the ALJ did conclude that plaintiff had a medically determinable impairment. While he did not give controlling weight to McColl's and Lowe's opinions, that decision was not an error, for the reasons explained above. Thus, the only difference it would have made for the ALJ to treat McColl's and Lowe's opinions as "acceptable medical sources" is that it would have enabled him to treat them as "medical opinions." But it seems the ALJ did so anyway, because he gave their opinions "significant weight" and cited them extensively to confirm his assessment of plaintiff's mental health conditions. *See* Doc. #11-3 at 48.

Nevertheless, on remand the ALJ should explicitly consider whether McColl's and Lowe's opinions are acceptable medical sources in light of the fact that they were co-signed by

---

[5] The ALJ acknowledged Dr. Riordan's co-signature when summarizing McColl's December 2013 opinion, *see* Doc. #11-3 at 48, but did not note Dr. Riordan's co-signature on McColl's March 2013 opinion or Lowe's October 2013 opinion. Furthermore, he did not acknowledge Dr. Riordan's signature when discussing the weight he was giving to any of the three opinions.

Dr. Riordan. *See Payne*, 2011 WL 2471288, at *5 (where physician assistant's opinion was co-signed by physician, ALJ "should have explained whether or not he considered these opinions to be the opinions of an appropriate medical source, and if not, then why[]").

### *Alleged Error re GAF Scores*

Plaintiff next argues that the ALJ misrepresented and gave too much weight to plaintiff's Global Assessment of Functioning scores. "Global Assessment of Functioning (GAF) is a scoring system for the severity of illness in psychiatry." IH Monrad Aas, "Guidelines for Rating Global Assessment of Functioning (GAF)," 10 Ann. Gen. Psychiatry 2. In his opinion, the ALJ cited plaintiff's GAF scores multiple times to support his conclusion that plaintiff's condition improved after 2013. He stated that such assessments were made on January 7, 2014, and February 3, 2014. Doc. #11-3 at 49. However, plaintiff correctly notes that on several of the dates on which the ALJ thought that someone had performed a GAF test, no test was actually performed. The ALJ appears to have misread the charts—the nurse was re-reporting old results on many of those charts, not indicating that a new measurement was taken. Therefore, there is no evidence in the record that GAF was assessed after December 2013. It was therefore not proper for the ALJ to use GAF scores as evidence that plaintiff had improved after 2013, and the ALJ should take this into account on remand.

The ALJ is not, however, required to completely ignore evidence of plaintiff's GAF scores. Plaintiff contends that the ALJ "essentially relied upon" the GAF scores, but the record does not indicate that the ALJ assigned improper weight to the GAF scores or relied on them to the exclusion of other evidence. The ALJ wrote that he gave the GAF scores "some weight," Doc. #11-3 at 41, and also explicitly acknowledged that "GAF scores are of limited evidentiary value as they reveal only snapshots of impaired or improved functioning." *Id*. at 39–40. On

12

remand, once the ALJ corrects the time-frame error described above, he will still be entitled to rely on the GAF scores to a small extent, as ALJs have done in multiple instances approved by the Second Circuit. *See, e.g.*, *Camille v. Colvin*, 652 F. App'x 25, 28 n.2 (2d Cir. 2016); *Zokaitis v. Soc. Sec. Admin.*, 465 F. App'x 17, 19 (2d Cir. 2012); *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011).

### *Alleged Substitution of ALJ's Medical Judgment for that of Medical Experts*

Plaintiff argues that the ALJ erred by substituting his own medical judgment for that of medical experts in two ways. First, plaintiff objects to the ALJ's finding that "the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual due to psychiatric impairments." Doc. #11-3 at 38 (noting "that there was no evidence of frequent visits to the emergency room for psychiatric symptoms or frequent and extended psychiatric hospitalizations"). Plaintiff argues that in making this statement, the ALJ has impermissibly evaluated the medical evidence himself. While it is true that an ALJ is not permitted to "play doctor," the ALJ did not do so here. Rather, the ALJ considered medical evidence and then decided whether that evidence supports a disability claim. Moreover, he did not use the cited evidence to override the opinion of a medical expert.

Second, plaintiff objects to the ALJ's decision to give "slight weight" to the fact that "the claimant betrayed no evidence of pain or psychiatric symptoms" during the two administrative hearings. *Id.* at 39. In *Aubeuf v. Schweiker*, 649 F.2d 107 (2d Cir. 1981), the Court of Appeals reviewed the opinion of an ALJ who made a similar observation. That ALJ had based a credibility determination in part on his "observation of the claimant at the hearing." *Id.* at 113. The Second Circuit noted that the ALJ's finding "raises serious questions with respect to the propriety of subjecting claimants to a 'sit and squirm index.'" *Ibid.*; *see also Burden v. Astrue*,

2008 WL 5083138, at *14 (D. Conn. 2008) ("Such a 'sit and squirm' test is not considered a reliable index of credibility. However, the ALJ may give limited weight to his observation of the claimant."), *report and recommendation adopted*, 588 F. Supp. 2d 269 (D. Conn. 2008).

Although some courts have allowed ALJs to give "limited weight" to a claimant's behavior at the administrative hearing, here the ALJ erred by giving plaintiff's demeanor any weight at all. In most of the "sit and squirm" cases in this circuit, plaintiff's alleged disability was in part disabling pain. *See, e.g.*, *Aubeuf*, 649 F.2d at 109; *Burden*, 2008 WL 5083138, at *14. In such cases, there is at least a correlation, however slight, between the alleged condition and a plaintiff's demeanor at the hearing. The condition alleged here, on the other hand, is not chronic; it is alleged to be triggered in some situations but not others. The ALJ did not find that an administrative hearing was a situation that would be expected to trigger plaintiff's symptoms. Therefore, plaintiff's demeanor at the administrative hearing was not relevant to his credibility in the manner that the ALJ suggested. On remand, the ALJ should not consider the plaintiff's demeanor at his hearings unless he makes an explicit finding that such evidence is relevant to plaintiff's credibility.

### *Alleged Error in Finding that Plaintiff Is Able to Do Jobs Requiring "Frequent" Use of the Upper Extremities*

Lastly, plaintiff challenges the ALJ's finding that plaintiff "is able to frequently use his upper extremities for handling, fingering, and feeling." Doc. #11-3 at 35. Plaintiff argues that this finding is unsupported by substantial evidence. I do not agree.

The bulk of the evidence related to plaintiff's motor capabilities concerned his performance of motor tasks when he is stressed. For example, plaintiff testified that he begins to fidget when he is overwhelmed. *Id*. at 80. Furthermore, his sister testified that he shakes when under stress. *Id.* at 114. The ALJ clearly considered this testimony. He explicitly acknowledged

it, *see id.* at 37, and also found that plaintiff could not "perform high-paced or stressful work." *Id.* at 35.

Plaintiff argues that the ALJ nevertheless erred in finding that plaintiff could perform the job of "laundry folder," which plaintiff contends is stressful and fast-paced. This argument is without merit. In the hearing, the VE suggested the job of laundry folder after the ALJ told him to name jobs that did *not* require "high-paced or stressful work." *Id.* at 159. The ALJ acted reasonably in deferring to the VE's expertise about the requirements of being a laundry folder.

There was one piece of evidence in the record suggesting that plaintiff had trouble with repetitive motor tasks not only in stressful situations, but all the time. At one point in the hearing, plaintiff testified that he had trouble with such tasks without indicating that this occurred only in stressful situations. *Id.* at 88. In his opinion, the ALJ did not explicitly acknowledge this testimony before concluding that plaintiff had the ability to frequently use his upper extremities for handling, fingering, and feeling.

In a Social Security disability case, "the ALJ must consider any other information the claimant submits about his symptoms" when assessing a claimant's RFC. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). Nevertheless, "if the evidence in the record permits a reviewing authority to 'glean the rationale of an ALJ's decision,' the ALJ is not required to mention every item of testimony or to explain why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Felix v. Astrue*, 2012 WL 3043203, at *9 (E.D.N.Y. 2012). In other words, "an ALJ is not required to discuss every piece of evidence submitted." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (*per curiam*).

Thus, the ALJ did not err by failing to explicitly acknowledge one particular portion of plaintiff's testimony. It is reasonably clear from the ALJ's opinion that he considered plaintiff's

15

claim and rejected it based on the evidence in the record. The ALJ considered plaintiff's testimony generally and found it to be "not entirely credible." Doc. #11-3 at 38. The ALJ also noted that physical examinations of the claimant "revealed that the claimant's extremities were within normal limits." *Id.* at 40; *see also* Doc. #11-9 at 70 ("psychomotor WNL [within normal limits]"); *id.* at 89 ("WNL" is checked next to "Neurological"). The ALJ's failure to explicitly discuss the portion of plaintiff's testimony relating to repetitive motor tasks was not an error, and the ALJ's finding that plaintiff had frequent use of his upper extremities was supported by substantial evidence.

## CONCLUSION

Plaintiff's motion to reverse or remand the decision of the Commissioner (Doc. #17) is GRANTED. Defendant's motion to affirm the decision of the Commissioner (Doc. #24) is DENIED. The case is remanded to the Commissioner for further proceedings consistent with this opinion.

It is so ordered.

Dated at New Haven, Connecticut, this 3rd day of August 2017.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge